**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| AEGIS 11 S.A., | ) | |
| Plaintiff, | ) | Civil Action |
| | ) | |
| v. | ) | No. 1:19-cv-01161-RGA |
| | ) | |
| BELKIN INTERNATIONAL, INC., | ) | |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| AEGIS 11 S.A., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | |
| NETGEAR, INC., | ) | No. 1:19-cv-01162-RGA |
| Defendant. | ) | |
| | ) | |

| | | |
|---|---|---|
| AEGIS 11 S.A., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | |
| ROKU, INC., | ) | No. 1:19-cv-01163-RGA |
| Defendant. | ) | |

| | | |
|---|---|---|
| AEGIS 11 S.A., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action |
| | ) | |
| RUCKUS WIRELESS, INC., | ) | No. 1:19-cv-01164-RGA |
| ARRIS US HOLDINGS, INC., | ) | |
| ARRIS INTERNATIONAL, INC., | ) | |
| ARRIS ENTERPRISES LLC, | ) | |
| ARRIS SOLUTIONS, INC., and | ) | |
| COMMSCOPE HOLDING COMPANY, | ) | |
| INC., | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS
<u>PARTIAL MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION AND SUMMARY OF ARGUMENTS ............................................... 1

II.     LEGAL STANDARD ............................................................................................................. 4

        A.      Legal Standard for Motion to Dismiss ..................................................................... 4

        B.      The Law of Patent-Ineligible Abstract Ideas .......................................................... 5

III.    ARGUMENT .......................................................................................................................... 7

        A.      The '553 Patent Specification .................................................................................. 8

        B.      Claim 1 of the '553 Patent Is Directed to the Abstract Idea of Generating
                and Using Random Numbers as Part of a Mutual Authentication Process ............. 9

                1.      The Specification Confirms That the Technical Details of Claim 1
                        Were Already Conventional ......................................................................... 9

                2.      Comparable Cases Confirm that Claim 1 is Directed to an Abstract
                        Idea ............................................................................................................... 11

        C.      Claim 1 Does Not Recite an "Inventive Concept" ................................................ 14

IV.     CONCLUSION ..................................................................................................................... 16

## TABLE OF AUTHORITIES

**Cases**

*3G Licensing, S.A. v. Blackberry Ltd.,* 302 F. Supp. 3d 640 (D. Del. 2018) ...................................4

*Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121
    (Fed. Cir. 2018) ...................................................................................................................3

*Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266 (Fed. Cir. 2016) ..........................3

*Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014)...........................................1, 3, 5-7, 9, 14-15

*Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15cv478, 2016 WL 3670804
    (E.D. Va. July 5, 2016), aff'd, No. 2016-2415, 2018 WL 4352098
    (Fed. Cir. Sept. 11, 2018)................................................................................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................................3

*Ass'n of Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576 (2013) ..............................5

*Automated Tracking Solutions, LLC v. Coca-Cola Co.*, No. 2017-1494,
    2018 WL 935455 (Fed. Cir. Feb. 16, 2018) .....................................................................3

*Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018)..................................................................3

*Berkheimer v. HP Inc.*, 890 F.3d 1369 (Fed. Cir. 2018)............................................................3, 16

*Bilski v. Kappos,* 130 S. Ct. 3218 (2008)........................................................................................7

*In re Bilski*, 545 F.3d 943 (Fed. Cir. 2008) (*en banc*),
    aff'd, *Bilski v. Kappos*, 561 U.S. 593 (2010) .................................................................. 4-5

*BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281 (Fed. Cir. 2018)...................................5, 7, 16

*buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350 (Fed. Cir. 2014).....................................................4

*Cardpool, Inc. v. Plastic Jungle, Inc.*, No. C 12-04182 WHA, 2013 WL 245026
    (N.D. Cal. Jan. 22, 2013) ...................................................................................................4

*Citrix Sys., Inc. v. Avi Networks, Inc.*, Case No. 17-1843-LPS, 2019 WL 582480
    (D. Del. Feb. 13, 2019) ....................................................................................................16

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
    776 F.3d 1343 (Fed. Cir. 2014)......................................................................................4, 6

*CyberFone Sys., LLC v. CNN Interactive Group, Inc.*, 558 Fed. Appx. 988
    (Fed. Cir. 2014)...................................................................................................................4

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) ...................... 12-13

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012) ...................................................4

*Diamond v. Diehr*, 450 U.S. 175 (1981)...................................................................................5

*Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016)............................................5

*Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317 (Fed. Cir. 2012)...............................6

*Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*, No. 12-1736-LPS-CJB,
    2014 WL 4379587 (D. Del. Sept. 3, 2014)..................................................................4

*Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363 (Fed. Cir. 2017).....................15

*Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315 (Fed. Cir. 2017) .....................6

*Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) ................... 14-15

*Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343 (Fed. Cir. 2015) ...........................5

*Interval Licensing LLC v. AOL, Inc.*, 2018 WL 3485608 (Fed. Cir. July 20, 2018) .....................11

*IPA Techs., Inc. v. Amazon.com, Inc.*, No. 16-1266-RGA, 2018 WL 1583051
    (D. Del. Mar. 31, 2018)...............................................................................................4

*IPA Techs., Inc. v. Amazon.com, Inc.*, No. 16-1266-RGA, 2019 WL 259100
    (D. Del. Jan. 18, 2019)..........................................................................................3, 7, 15

*OIP Techs., Inc. v. Amazon.com, Inc.*, No. C-12-1233 EMC, 2012 WL 3985118
    (N.D. Cal. Sept. 11, 2012) ...........................................................................................4

*P&RO Sols. Grp., Inc. v. CIM Maint., Inc.*, 273 F. Supp. 3d 699 (E.D. Tex. 2017).....................13

*Parker v. Flook*, 437 U.S. 584 (1978)........................................................................................5

*Prism Technologies LLC v. T-Mobile USA, Inc.,* 696 Fed. Appx. 1014
    (Fed. Cir. 2017)..................................................................................................... 12-13

*RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322 (Fed. Cir. 2017)....................................5

*TriPlay, Inc. v. WhatsApp Inc.*, No. 13-1703-LPS-CJB, 2018 WL 1479027
    (D. Del. Mar. 27, 2018).................................................................................................4

*Tuxis Techs., LLC v. Amazon.com, Inc.*, No. 13-1771-RGA, 2014 WL 4382446
    (D. Del. Sept. 3, 2014)...................................................................................................4

*UbiComm, LLC v. Zappos IP, Inc.*, No. 13-1029-RGA, 2013 WL 6019203
    (D. Del. Nov. 13, 2013) .................................................................................................4

*Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014)..................................................4, 6

**Statutes**

35 U.S.C. § 101...................................................................................................... 1, 3-5, 7

**Other Authorities**

Rule 12(b)(6)........................................................................................................... 3-4

Defendants Roku, Inc., NETGEAR, Inc., Belkin International, Inc., Ruckus Wireless, Inc., ARRIS US Holdings, Inc., ARRIS Enterprises LLC, ARRIS Solutions, Inc., and CommScope Holding Company, Inc. (collectively, "Defendants")[1] respectfully bring this Partial Motion to Dismiss against Count 1 of Plaintiff AEGIS 11 S.A.'s ("AEGIS") Complaint[2] for infringement of U.S. Patent No. 6,839,553 ("the '553 Patent[3]").

## I.  INTRODUCTION AND SUMMARY OF ARGUMENTS

The claims of the '553 Patent, which issued in 2005, are directed to patent-ineligible subject matter under 35 U.S.C. § 101 and the case law following *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).  Claim 1 of the '553 Patent, which is the only asserted claim identified in the Complaint, is directed to nothing more than the abstract idea of generating and using random numbers as part of a mutual authentication process.  While the claim language may appear technical at first blush, the patent itself belies any notion that these claims are directed to a technical improvement.

Claim 1 states:

> 1. A method of managing mobile station operational parameters in a wireless communication network comprising:
>
> transmitting a message from a network to a mobile station to indicate an initiation of an update of the mobile station operational parameters; and
>
> updating the mobile station operational parameters after completing a mutual authentication between the mobile station and the network, wherein the mutual authentication comprises each of an authentication of the mobile station by the network and an authentication of the network by the mobile station, and wherein the mutual authentication is performed by generating at least one random number by each of the network and the mobile station.

---

[1] While ARRIS International, Inc. has also been named as a defendant in Case No. 1:19-cv-01164, Defendant ARRIS International, Inc. is not an existing corporate entity.

[2] Because AEGIS's complaints against the Defendants do not differ in substantial ways, Defendants cite to Case No. 1:19-cv-01163-RGA, D.I. 1 ("Complaint") for purposes of this Motion.

[3] The '553 Patent is attached as Exhibit A to the Complaint.

D.I. 1, Ex. A at 8:44-8:58.  In essence, claim 1 covers the transmission of information between two devices after the completion of a mutual authentication process involving the generation of random numbers by each device.  Claim 1 lacks any detail regarding how the random numbers are generated, why they are generated or how the generation of those numbers leads to the mutual authentication.  In other words, claim 1 is limited to the abstract idea of using random numbers to mutually authenticate a transmission.

The '553 Patent specification confirms that claim 1 covers an abstract idea.  In particular, the specification confirms that all of the following are in the prior art:

- wirelessly updating mobile station operating parameters in a mobile communication network ('553 Patent at 1:17-30, 1:36-41);

- mutual authentication of the mobile station to the network and the network to the mobile station (*Id*. at 1:42-45, 1:53-54); and

- authentication of the network to the mobile station using random numbers.  (*Id*. at 1:38-46 (expressly incorporating by reference PCT application No. WO98/41044); *see also* Ex. A at pg. 23, ln. 6-15).[4]

Indeed, the specification of the '553 Patent readily admits that the inventors did not invent the "mobile station," "wireless communication network," "mobile station operational parameters," wireless updating of such parameters,[5] or mutual authentication of the mobile station to the network and of the network to the mobile station.  In the context of the '553 Patent's discussion of the prior art, and after stripping away the already known (*i.e.*, admittedly conventional technology), the purported novelty disclosed in claim 1 is simply generating random numbers for this two-way authentication.  That's it—there is nothing more to this claim.

---

[4] For the Court's convenience, this document is attached as Ex. B to this Motion.

[5] The specification of the '553 Patent readily admits that the particular wireless updating of mobile station operating parameters recited in the claims, and the authentication of the network to the mobile station, was standardized.  '553 Patent at 1:36-45.

This allegedly novel improvement over the prior art is purely abstract. Network devices have generated random numbers for ages including, as admitted by the '553 Patent, for the purpose of authentication. The claim simply applies this longstanding practice in an admittedly prior art environment to achieve admittedly prior art results, which does not convert this abstract idea into patent-eligible subject matter. *See Alice*, 134 S. Ct. at 2358. Where, as here, the patent expressly admits that the technical details of the claimed subject matter were already known, routine, or even standardized, there are no underlying factual questions to resolve prior to determining that claim 1 of the '553 Patent claims ineligible subject matter.[6] Resolving this issue also does not require additional discovery or claim construction. Thus, claim 1 of the '553 Patent is ineligible and Defendants are entitled to dismissal of Count I of the Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

[6] Judgment on the pleadings cannot be defeated by conclusory averments of an inventive concept in the Complaint, or in responsive pleadings by AEGIS, or which contradict the specification or which are not found in the claims. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79, 681 (2009); *Affinity Labs of Tex., LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1259-60 (Fed. Cir. 2016); *Automated Tracking Solutions, LLC v. Coca-Cola Co.*, No. 2017-1494, 2018 WL 935455, at *5 (Fed. Cir. Feb. 16, 2018); *IPA Techs., Inc. v. Amazon.com, Inc.*, No. 16-1266-RGA, 2019 WL 259100, at *5 (D. Del. Jan. 18, 2019) (*citing Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) ("plausible factual allegations may preclude dismissing a case under § 101 where, for example, nothing on the record refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)" (internal quotation omitted)); *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("improvements in the specification, to the extent . . . captured in the claims, create a factual dispute"); *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1371 (Fed. Cir. 2018) (denial of rehearing en banc) ("In a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute.").

## II.    LEGAL STANDARD

### A.    Legal Standard for Motion to Dismiss

Patent eligibility under 35 U.S.C. § 101 is a "threshold inquiry" where "one must focus on the [patent] claims" to determine whether any actionable claim exists.  *In re Bilski*, 545 F.3d 943, 950-51 (Fed. Cir. 2008) (*en banc*), *aff'd, Bilski v. Kappos*, 561 U.S. 593 (2010); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1334 (Fed. Cir. 2012).  Only an "understanding of the basic character of the claimed subject matter" is required to resolve the legal issue of patent-eligible subject matter.  *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. 2014).  Accordingly, a § 101 inquiry may be raised in a motion to dismiss under Rule 12(b)(6).  *See, e.g., 3G Licensing, S.A. v. Blackberry Ltd.,* 302 F. Supp. 3d 640, 651 (D. Del. 2018) (granting motion to dismiss); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 713 (Fed. Cir. 2014) (affirming grant of "pre-answer motion to dismiss under Rule 12(b)(6) without formally construing the claims"); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014); *CyberFone Sys., LLC v. CNN Interactive Group, Inc.*, 558 Fed. Appx. 988, 991 n.1 (Fed. Cir. 2014) (non-precedential) ("There is no requirement that the district court engage in claim construction before deciding § 101 eligibility.").  District courts around the country, including this Court, have routinely granted Rule 12(b)(6) motions on § 101 grounds without engaging in formal claim construction.[7]

---

[7] *3G Licensing, S.A.,* 302 F. Supp. 3d at 655 (granting motion to dismiss); *IPA Techs., Inc. v. Amazon.com, Inc.*, No. 16-1266-RGA, 2018 WL 1583051, at *12 (D. Del. Mar. 31, 2018) (same); *TriPlay, Inc. v. WhatsApp Inc.*, No. 13-1703-LPS-CJB, 2018 WL 1479027, at *12 (D. Del. Mar. 27, 2018) (same); *Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*, No. 12-1736-LPS-CJB, 2014 WL 4379587, at *14 (D. Del. Sept. 3, 2014) (same); *Tuxis Techs., LLC v. Amazon.com, Inc.*, No. 13-1771-RGA, 2014 WL 4382446, at *6 (D. Del. Sept. 3, 2014) (same); *UbiComm, LLC v. Zappos IP, Inc.*, No. 13-1029-RGA, 2013 WL 6019203, at *6-7 (D. Del. Nov. 13, 2013) (same); *Cardpool, Inc. v. Plastic Jungle, Inc.*, No. C 12-04182 WHA, 2013 WL 245026, at *4 (N.D. Cal. Jan. 22, 2013) (same); *OIP Techs., Inc. v. Amazon.com, Inc.*, No. C-12-1233 EMC, 2012 WL 3985118, at *20 (N.D. Cal. Sept. 11, 2012) (same).

### B.    The Law of Patent-Ineligible Abstract Ideas

Abstract ideas "are not patentable" under 35 U.S.C. § 101. *Alice*, 134 S. Ct. at 2354 (quoting *Ass'n of Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). *Alice* mandates a two-step framework to determine whether patents claim unpatentable abstract ideas. *See id.* at 2355. In *Alice* step one, a court must determine whether, in light of the patent's specification, the claims' "character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015). As part of that analysis, courts assess "whether the claims are directed to a specific means or method for improving technology or whether they are simply directed to an abstract end-result." *RecogniCorp, LLC v. Nintendo Co., Ltd.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017) (internal quotes omitted). Comparing the "claims at issue to those claims already found to be directed to an abstract idea in previous cases" also informs this inquiry. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). The factual conclusion that practicing a claim improves computer functionality does not end the *Alice* step one inquiry. Rather, the Court must also consider the source of the improved computer functionality. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018). A claim is not "directed to" an improvement in computer functionality if the technical benefits flow solely from performing an abstract idea in conjunction with well-understood structure. *Id*.

A claim also does not reflect a technical improvement if it includes only token or insignificant pre- or post-solution activity, such as identifying a relevant audience, category of use, field of use, or technological environment. *Mayo*, 132 S. Ct. at 1297-98, 1300-01; *Bilski*, 561 U.S. at 609-612; *Diamond v. Diehr*, 450 U.S. 175, 191-92 & n.14 (1981); *Parker v. Flook*, 437 U.S. 584, 595 n.18 (1978). And "simply appending conventional steps, specified at a high level of generality, to laws of nature, natural phenomena, and abstract ideas

5

cannot make those laws, phenomena, and ideas patentable." *Mayo*, 132 S. Ct. at 1300; *see also Fort Props., Inc. v. Am. Master Lease LLC*, 671 F.3d 1317, 1323 (Fed. Cir. 2012) ("Such a broad and general limitation does not 'impose meaningful limits on the claim's scope.'"). Likewise, merely limiting the use of the abstract idea to a particular technological environment is insufficient to save an otherwise patent-ineligible claim. *See Ultramercial*, 772 F.3d at 716 ("Narrowing the abstract idea of using advertising as a currency to the Internet is an 'attempt[] to limit the use' of the abstract idea 'to a particular technological environment,' which is insufficient to save a claim.") (*quoting Alice*, 134 S. Ct. at 2358) (alterations in original). Moreover, while dependent claims may have a narrower scope than the representative independent claims, in order to transform the claim into a patent-eligible application of the ineligible concept they must themselves define an "inventive concept." *Content Extraction*, 776 F.3d at 1349.

If the claims are directed to an abstract idea, then a court must proceed to *Alice* step two, where the analysis shifts to determine whether the claims include an "inventive concept" "sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. To avoid invalidation under this second step, the claims "must include additional features" that "must be more than well-understood, routine, conventional activity." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014) (citations and internal quotation marks omitted); *see also Intellectual Ventures I LLC v. Erie Indemnity Co.*, 850 F.3d 1315, 1331 (Fed. Cir. 2017) (requiring claims do more than "simply recite[] that the abstract idea will be implemented using the conventional components and functions generic to" a given technological environment). "Factual allegations in the pleadings that allege that claim elements are not well understood, routine or conventional are not taken as true where

they contradict admissions in the specification or the claims themselves." *IPA Techs.*, 2019 WL 259100, at \*5 (internal citations omitted). Moreover, "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *BSG Tech*, 899 F.3d at 1290. Instead, the relevant question is "whether the claim limitations *other than the invention's use of the ineligible concept* to which it was directed were well-understood, routine and conventional." *Id*. (emphasis added).

## III.    ARGUMENT

The '553 Patent issued in 2005, almost a decade before the Supreme Court's decision in *Alice*. In 2005, before patent examiners were familiar with post-*Alice* examination guidelines, claims like those in the '553 Patent that recited age-old concepts performed on generic hardware (*e.g.*, a "mobile device" or "network") typically avoided scrutiny under Section 101. *See, e.g., Bilski v. Kappos,* 130 S. Ct. 3218, 3227 (2008) (holding that "the machine-or-transformation test is a useful and important clue, an investigative tool, for determining whether some claimed inventions are processes under § 101," although "not the sole test."). That is no longer the case. The Federal Circuit has refined its jurisprudence on subject matter eligibility and, when assessed under the current and governing legal standard, it is evident that asserted claim 1 of the '553 Patent is directed to the abstract idea of generating and using random numbers as part of a mutual authentication process. The additional elements of the claims are directed to routine and admittedly conventional implementation details, such as using admittedly well-known software with admittedly well-known authentication concepts, applied in the admittedly known and standardized technological environment of Over-The-Air Parameter Administration (OTAPA).

7

A.    The '553 Patent Specification

The '553 Patent purports to address a problem in existing Over-the-Air Parameter Administration systems and methods ("OTAPA") when updating mobile stations with changes to operating parameters. The "background" of the '553 Patent provides a history of OTAPA and incorporates other publications describing OTAPA. '553 Patent at 1:36-1:41. In doing so, the '553 Patent frames the extent to which the claimed method is an extension of this existing system rather than an invention of the patentee.

According to the '553 Patent, OTAPA was "a technology which allows changing of specific parameters of the mobile station by wireless communication." *Id.*, 1:36-39. Also according to the '553 Patent, OTAPA included "an authentication procedure for a communication network . . . such that a mobile station may confirm whether the network is correct." *Id.*, 1:42-46. PCT application No. WO 98/41044, which is expressly incorporated into the '553 Patent by reference (*Id.*, 1:38-41), provides additional detail regarding the authentication scheme that was part of OTAPA, including the generation of random numbers during the process:

> Subsequent to being notified by the network that an update procedure is to be initiated, the mobile station initiates a network validation scheme referred to herein as SPASM. **SPASM uses portions of a previously used authentication scheme**. In the SPASM process, **the mobile station generates a random number** which is combined with other internally stored information to produce a unique authorization word. The home network has a copy of this stored information. Typically this is stored in the AC and thus the network generates the same unique authorization word after receiving a copy of the random number generated within the mobile station. This network generated authorization word is returned to the mobile station where it is compared. Upon successful comparison, the mobile station performs a service lock process (actually an unlock process) and then performs the OTAPA update procedure.

'044 Application (Ex. A) at pg. 23, ln. 6-15 (emphasis added).

8

However, an alleged problem with OTAPA was that OTAPA provided only "one-way" authentication whereby the mobile station could authenticate the network, but the network could not authenticate the mobile station. '553 Patent at 1:42-52. The '553 Patent acknowledges that existing networks could authenticate the mobile station before the OTAPA process, but alleged that doing so would "elongate" the OTAPA process. '553 Patent at 1:53-57. The '553 Patent purports to address these problems by changing OTAPA's one-way, random number authentication process to a mutual, random number authentication process.

**B.      Claim 1 of the '553 Patent Is Directed to the Abstract Idea of Generating and Using Random Numbers as Part of a Mutual Authentication Process**

Claim 1 of the '553 Patent is directed to the abstract idea of generating and using random numbers (which network devices have done for ages) for the purpose of mutual authentication (authentication, as admitted by the '553 Patent, was a known, conventional purpose). The claim simply applies this basic concept to the field of a "mobile station" in a "wireless communication network," and, in particular, in the context of prior art authentication and prior art operational parameter update processes. Claim 1 lacks any detail regarding how the random numbers are generated, why they are generated or how the generation of those numbers leads to the mutual authentication. *Alice* dictates that such basic, abstract ideas are not patentable.

The crucial question, therefore, is the extent to which the specification admits that all of the technical details of the claims were already conventional. On this point, the specification leaves no doubt.

**1.      The Specification Confirms That the Technical Details of Claim 1 Were Already Conventional**

The specification confirms that each step recited in claim 1 comprises nothing more than a generic, well-known process that was either already standardized (*i.e.*, already part of

9

OTAPA) or is recited in such general, functional terms to not constitute a patent eligible concept. Moreover, the combination of these generic processes to purportedly manage a mobile station is also abstract. *See Elec. Power Grp.*, 830 F.3d at 1354 ("Here, the claims are clearly focused on the combination of those abstract-idea processes. The advance they purport to make is a process of gathering and analyzing information of a specific content, then displaying the results, and not any particular assertedly inventive technology for performing those functions. They are therefore directed to an abstract idea.").

The specification acknowledges that the steps of "transmitting a message from a network to a mobile station to indicate an initiation of an update of the mobile station operational parameters" and "updating the mobile station operational parameters" are not inventive, but rather part of the existing OTAPA system that was standardized. '553 Patent at 1:17-30, 1:36-45. This analysis can begin and end with the specification where it is admitted that wirelessly transmitting and updating parameters was a conventional part of the existing OTAPA system:

> A further object of the present invention is to allow a management which can perform a mutual authentication between a mobile station and a network while maintaining the same number of mobile station operational parameter updating procedure as in the conventional procedure. '553 Patent at 2:6-11.

Similarly, the specification acknowledges that the concept of using "authentication" between the "mobile station" and the "network" as part of this well-known, standardized updating process was also known and standardized. '553 Patent at 1:42-44 ("an authentication procedure for a communication network is included in the OTAPA process"). And the specification acknowledges that the concept of mutual authentication was also known. '553 Patent at 1:53-54 ("[T]he network may first perform an authentication procedure of a mobile stations before the OTAPA process."). Moreover, by expressly incorporating by reference

10

the '044 Application (Ex. A), the specification also acknowledges that generating and using random numbers for the purpose of "authentication" was also known and standardized.  *Id*. at 1:38-41 ("The OTAPA is disclosed in . . . PCT application No. WO 98/4104 by Northern Telecom Inc., fully incorporated herein."), 1:60-62; § III.A above (*citing* Ex. A at pg. 23, ln. 6-15.) (emphasis added).

Thus, all that remains of claim 1 is that, instead of generating and using random numbers to authenticate the network and separately authenticating the mobile station, the mobile station is also authenticated using random numbers.  However, claim 1 lacks any detail regarding how the random numbers are generated, why they are generated or how the generation of those numbers leads to the two-way or "mutual" authentication.  As such, these features fail to constitute a patent eligible concept because they are recited in such a generic and results-oriented manner that the patent is directed to the abstract concept—generating and using random numbers for the purpose of mutual authentication—rather than application of that concept in a meaningful way.  This is a problem of the patentee's own doing.  Despite ample discussion in the specification providing concrete ways the claimed mutual authentication could be performed, claim 1 did not include any such detail.  *See Interval Licensing LLC v. AOL, Inc.*, 2018 WL 3485608, at \*7 (Fed. Cir. July 20, 2018) (finding limitation abstract because it "demands the production of a desired result . . . without any limitation on how to produce that result.").

### 2. Comparable Cases Confirm that Claim 1 is Directed to an Abstract Idea

Several similar cases also demonstrate that claim 1 of the '553 Patent is directed to an abstract idea.  The Federal Circuit has repeatedly found claims directed to authenticating a user's identity, authenticating information, and, generally, verifying information to be

11

directed to abstract concepts that are ineligible for patent protection.  *See Prism Technologies LLC v. T-Mobile USA, Inc.,* 696 Fed. Appx. 1014 (Fed. Cir. 2017) (claims reciting "authenticating . . . identity data" found abstract); *Secured Mail*, 873 F.3d at 906 (invalidating claims relating to "authenticating information"); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366 (Fed. Cir. 2011) (claims relating to verification of credit card transactions found abstract).

In *Prism*, the Federal Circuit found ineligible claims relating to computer security and, more particularly, authentication of identity data.  *See Prism*, 696 F. App'x at 1017.  The claims at issue recited a "method for controlling access . . . to protected computer resources" that included "receiving . . . identity data associated with at least one client computer device" and "authenticating . . . the identity data." *Id.* at 1016. The Court found the claims impermissibly abstract because—as is also the case here—they were "directed to the abstract idea of providing restricted access to resources." *Id.* at 1017 (quotations omitted).  The fact that the claims recited authentication of identity data did not save the claims. Indeed, the claims as a whole were found to be directed to nothing more than an abstract process. *See id.*

Similarly, in *Secured Mail*, the Federal Circuit found ineligible claims reciting a method for verifying the authenticity of a mail object. *See Secured Mail*, 873 F.3d at 907.  In that case, the recipient of a mail object could use authenticating information on the mail object "to verify that a mail object is authentic" by looking up that authenticating information in a database. *Id.* Despite the presence of such authenticating information, the claims were found impermissibly abstract because no special rules or details of the computers or databases used to implement the alleged invention were recited in the claims. *See id.* at 910.  Like the claims at issue in *Secured Mail*, claim 1 here also does not recite any detail of how the random

numbers are generated, why they are generated or how the generation of those numbers leads to the two-way or "mutual" authentication between the devices.[8]

Like the claims found ineligible in *Prism* and *Secured Mail*, claim 1 is, at its core, directed to a type of "authentication" on a network. Moreover, also like the claims found ineligible in *Prism* and *Secured Mail*, the concept of authentication in claim 1 is recited so broadly and detached from how to implement the concept that the claim is ultimately directed to the idea of mutual authentication itself rather than any practical use of this concept in a meaningful way. Thus, claim 1 is not directed to a patent eligible concept, but is instead directed to the abstract idea of generating and using random numbers for the purpose of authentication.

The abstract nature of the claims is confirmed by the fact that the claims embrace ideas that can be performed by a human without the help of any generic computer process. *See P&RO Sols. Grp., Inc. v. CIM Maint., Inc.*, 273 F. Supp. 3d 699, 708 (E.D. Tex. 2017) ("Because the claims can be performed by using pen and paper or recite generic computer functionality, the claim is directed to an abstract idea.") (citing *CyberSource*, 654 F.3d at 1372). The concept of mutual authentication using random numbers has been performed by parties communicating in secret for decades, if not centuries. For example, during World War II, German agents used "Enigma" machines to generate random numbers that were then used to draft coded messages and "authenticate" themselves as an operator of the machine. Other

---

[8] District courts have also found claims directed to general methods of "authentication" to be patent ineligible. *See Falkon Treasures*, 2017 WL 1399648, at *2 (finding claims reciting "[t]he concept of validating a customer's identity" to be abstract), adopted by 2017 WL 1376447, at *1 (E.D. Tex. Apr. 17, 2017); *Asghari-Kamrani v. United Servs. Auto. Ass'n*, No. 2:15cv478, 2016 WL 3670804, at *2 (E.D. Va. July 5, 2016) (invalidating claims reciting "a method for authenticating a user during an electronic transaction between the user and an external-identity"), aff'd, No. 2016-2415, 2018 WL 4352098 (Fed. Cir. Sept. 11, 2018).

agents who could also generate the random number could then "authenticate" themselves as a proper recipient of the message and decode the messages. This same basic concept is applied in claim 1 of the '553 patent, where network participants generate random numbers that are used to mutually authenticate one another.

### C.   Claim 1 Does Not Recite an "Inventive Concept"

Once an abstract idea is identified, the second step of the *Alice* test requires the court to evaluate whether the claims sufficiently recite "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice,* 134 S. Ct. at 2355 (internal quotations and citations omitted). Claim 1 of the '553 patent does not recite any such inventive concept. Although the claim language appears technical by reciting a particular environment, *i.e.*, a "mobile station" in a "wireless communication network," and by reciting steps of "managing" and "updating" "mobile station operational parameters," and "mutual authentication between the mobile station and the network," it ultimately recites nothing even arguably inventive beyond the abstract idea of mutual authentication using random numbers discussed above.

Most importantly, as discussed above, the '553 Patent does not purport to have invented the "mobile station," "wireless communication network," "mobile station operational parameters," wireless updating of such parameters, generating and using random numbers for the purpose of authentication, or mutual authentication of the mobile station to the network. *See* § III.B.1 above; *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016) (a patent's specification is "particularly useful in determining what is well-known or conventional"). Thus, the "network," "mobile station," and parameter updating technology that are the focus of claim 1 are the exact same network, mobile station,

14

and updating technology that is admitted in the specification to be a well-known feature of existing, and even standardized, systems. *Id*. These known features do not require an arguably inventive set of components or methods nor do they invoke any assertedly inventive programming and, therefore, cannot serve as an inventive concept to render claim 1 patent eligible. *Elec. Power Grp.*, 830 F.3d at 1355; *IPA Techs*., 307 F. Supp. 3d at 370.

The *Alice* inquiry also requires consideration of whether the "ordered combination" of limitations amounts to an inventive concept. *Alice*, 134 S. Ct. at 2355. However, in this case, the ordered combination of steps "ad[d] nothing ... that is not already present when the steps are considered separately." *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1298). Performing all of the steps in order creates nothing significant beyond the routine actions which make up each step individually discussed above. This is confirmed by the '553 Patent itself which admits that the *combination* of authentication for a communication network, wireless over the air parameter administration, and changing of specific parameters by wireless communications is conventional. '553 Patent at 2:35-45; '044 Application pg. 8, ln. 27–pg. 9, ln. 3.

Finally, the '553 Patent contends that mutual authentication during the conventional OTAPA process results in improved reliability of the management system, increased quality of service, and decreased load in a communication network. '553 Patent at 1:46-59, 1:65-2:10. Even if true, however, any such benefits would not constitute an inventive concept because they would merely be the result of applying the abstract idea itself. *See Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1367 (Fed. Cir. 2017) ("Nor, in addressing the second step of Alice, does claiming the improved speed or efficiency inherent with applying the abstract idea on a computer provide a sufficient inventive concept.")

15

(citation omitted); *Berkheimer*, 890 F.3d at 1371 ("In a situation where the specification admits the additional claim elements are well-understood, routine, and conventional, it will be difficult, if not impossible, for a patentee to show a genuine dispute."). Indeed, the only allegedly unconventional feature of the claim is generating and using random numbers for two-way (as opposed to one-way) authentication, and the claim fails to recite any detail regarding how the random numbers are generated, why they are generated or how the generation of those numbers leads to the two-way authentication. *See* § III.B.1 above. As this feature is the abstract idea itself, it cannot provide an inventive concept regardless of how beneficial the feature may be when applied in a technical context. *See BSG Tech*, 899 F.3d at 1290 ("[A] claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."); *see also, e.g., Citrix Sys., Inc. v. Avi Networks, Inc.*, Case No. 17-1843-LPS, 2019 WL 582480 at *8 (D. Del. Feb. 13, 2019).

## IV.    CONCLUSION

Because claim 1 of the '553 Patent fails to recite patent eligible subject matter, Count I of Aegis 11's Complaint, which asserts only this claim, fails to state a claim against Defendants, and should be dismissed with prejudice.

Dated:  October 15, 2019                    **DUANE MORRIS LLP**

*/s/ Richard L. Renck*
Richard L. Renck (#3893)
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Tel.:  (302) 657-4900
Fax:  (302) 657-4901
rlrenck@duanemorris.com

16

OF COUNSEL:

Matthew C. Gaudet (admitted *pro hac vice*)
Matthew S. Yungwirth (admitted *pro hac vice*)
Alison H. Hutton (admitted *pro hac vice*)
Alice E. Snedeker (admitted *pro hac vice*)
**DUANE MORRIS LLP**
1075 Peachtree Street NE, Suite 2000
Atlanta, GA  30309-3929

*Counsel for Belkin International, Inc.,*
*Ruckus Wireless, Inc., ARRIS US Holdings, Inc.,*
*ARRIS Enterprises LLC, ARRIS Solutions, Inc.,*
*and CommScope Holding Company, Inc.*


**ASHBY & GEDDES**

s/ *Steven J. Balick*
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899
Tel.:  (302) 654.1888

OF COUNSEL:

Kent E. Baldauf, Jr.
Bryan P. Clark
**THE WEBB LAW FIRM**
One Gateway Center
420 Ft. Duquesne Blvd., Suite 1200
Pittsburgh, PA 15222

*Counsel for Defendants Roku, Inc. and*
*NETGEAR, Inc.*

17